**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Billy NG, Tak Man Yee & Oswald K. Liew, Defendants-Appellees.**

**No. 539, Docket 82–1266.**

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1982.

Decided Jan. 13, 1983.

Jeffrey M. Smith, Boston, Mass. (Paul T. Smith, Harvey R. Peters, Boston, Mass., of counsel), for defendants-appellees Tak Man Yee and Oswald Liew.

Linda J. Thompson, Springfield, Mass. (Efrem A. Gordon, Springfield, Mass., of counsel), for defendant-appellee Billy Ng.

Peter W. Hall, Asst. U.S. Atty., Rutland, Vt. (George W.F. Cook, U.S. Atty., D. Vt., Patti R. Page, Asst. U.S. Atty., Rutland, Vt., of counsel), for plaintiff-appellant.

Before FEINBERG, Chief Judge, and MANSFIELD and KEARSE, Circuit Judges.

MANSFIELD, Circuit Judge:

The government appeals pursuant to 18 U.S.C. § 3731 from an order of the District of Vermont, entered on May 19, 1982 by Chief Judge James S. Holden after an evidentiary hearing, dismissing an indictment charging the three defendants-appellees in seven counts with violations of provisions of the Gun Control Act of 1968, 18 U.S.C. § 922(a)(6), and with conspiracy to violate 18 U.S.C. §§ 922(a)(3) and (6).[1] The district court, relying principally on *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), dismissed the charges on the ground that an appearance of vindictiveness was created when a United States Attorney brought charges against the defendants after they had, pursuant to a plea bargain with a state prosecutor, pleaded guilty to similar state charges arising out of the same facts. We reverse on the grounds that the circumstances do not present a substantial risk of vindictiveness and that the federal prosecution is by a different sovereign and therefore may proceed notwithstanding the earlier state prosecution. *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

On January 7, 1980 the three defendants drove in a rented Pontiac from New York City to Vermont where one of them, Billy Ng, 18 years of age, obtained a temporary Vermont driver's license by giving a false

---

1. Title 18 U.S.C. § 922 provides in relevant part:
   "(a) It shall be unlawful—
      *      *      *      *      *      *
   "(3) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a rifle or shotgun obtained in conformity with the provisions of subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter;
      *      *      *      *      *      *
   "(6) for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter."

name, Vermont address and birthdate, which he then used to purchase guns for $944 in cash. The defendants then started driving with the guns back to New York City by way of Massachusetts where they were stopped by Massachusetts state police acting on the basis of information furnished by the Bureau of Alcohol, Tobacco and Firearms (ATF) with respect to the purchase of the guns. Ng, after receiving *Miranda* warnings, admitted that he had purchased firearms. All three defendants stated that they did not have firearms identification cards. They were then held in the police barracks at Northampton, Massachusetts, where each defendant admitted to a federal ATF agent that he had traveled to Vermont to buy firearms and had bought two guns there. Pursuant to a federal search warrant obtained from the federal court, an ATF agent seized six handguns found in the Pontiac, several books about handguns, and other items.

On the next day, January 8, 1980, the three defendants appeared before a Massachusetts state judge who fixed bail at $15,000 each. In the meantime Assistant U.S. Attorney Kelly of the District of Massachusetts caused federal complaints to be filed against the defendants charging them with interstate transportation of illegally acquired firearms in violation of 18 U.S.C. § 922(a)(3). An Assistant U.S. Attorney for Vermont, Peter Hall, upon learning that the defendants would be prosecuted in Massachusetts by state or federal authorities or both, declined to file charges against the defendants in the District of Vermont. Kelly, after being assured by the Massachusetts local prosecutor, District Attorney Simons, that the defendants would be prosecuted by that state on firearms charges under Mass.Gen.Laws Ann. Ch. 269, § 10(a), which upon conviction mandated the imposition of a one-year jail term, advised the parties that he would defer to the state prosecution.[2] Kelly was of the view that if

2. Mass.Gen.Laws Ann. Ch. 269, § 10(a)(2), provides in relevant part:

"§ 10. Penalty for Unlawfully Carrying Dangerous Weapons, Possessing Machine Gun, etc.

"(a) Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a firearm, loaded or unloaded, as defined in section one hundred and twenty-four of chapter one hundred and forty without either:

(1) having in effect a license to carry firearms issued under section one hundred and thirty-one of chapter one hundred and forty; or

(2) having in effect a license to carry firearms issued under section one-hundred and thirty-one F of chapter one hundred and forty;

(3) complying with the provisions of section one hundred and twenty-nine C and one hundred and thirty-one G of chapter one hundred and forty; or

(4) having complied as to possession of an air rifle or BB gun with the requirements imposed by section twelve B of chapter two hundred and sixty-nine;

and whoever carries on his person, or carries on his person or under his control in a vehicle a rifle or shotgun, loaded or unloaded, without either:

(1) having in effect a license to carry firearms issued under section one hundred and thirty-one of chapter one hundred and forty; or

(2) having in effect a license to carry firearms issued under section one hundred and thirty-one F of chapter one hundred and forty; or

(3) having in effect a firearm identification card issued under section one hundred and twenty-nine B of chapter one hundred and forty; or

(4) having complied as to carrying, with the requirements imposed by section one hundred and twenty-nine C of chapter one hundred and forty upon ownership or possession of rifles and shotguns;

(5) having complied as to possession of an air rifle or BB gun with the requirements imposed by section twelve B of chapter two hundred and sixty-nine;

shall be punished by imprisonment in the state prison for not less than two and one-half nor more than five years, or for not less than one year nor more than two and one-half years in a jail or house of correction. The sentence imposed upon such person shall not be reduced to less than one year, nor suspended, nor shall any person convicted under this subsection (a) be eligible for probation, parole, or furlough or receive any deduction from his sentence for good conduct until he shall have served one year of such sentence; provided, however, that the commissioner of correction may, on the recommendation of the warden, superintendent, or other person in charge of a correctional institution, or the administrator of a county correctional institution, grant to an offender

the defendants were convicted, which seemed likely, the federal government's interest would be adequately protected by the one-year mandatory prison term. Accordingly, the federal complaint was dismissed on February 13, 1980 with the approval of the U.S. Magistrate. The written dismissal, copies of which according to Kelly were normally mailed to attorneys for defendants, expressly stated that it was "without prejudice to the rights of the United States to reinstitute proceedings against one or all of the defendants named in the Complaint."

One year later, in February 1981, another Massachusetts state prosecutor, William St. James, instead of continuing the prosecution under Mass.Gen.Laws Ann. Ch. 269, § 10(a) begun by his predecessor Mr. Simons, reached a plea agreement with the defendants under which they would plead guilty to lesser charges not carrying a one-year minimum sentence. Upon being informed of this proposed disposition Assistant U.S. Attorney Kelly advised the state prosecutor that the arrangement would not satisfy the federal government's interest and that he would probably recommend reinstitution of federal charges. He requested the state prosecutor to so notify the defendants.

On February 9, 1981, each of the defendants pleaded guilty to the reduced state charges and was sentenced to imprisonment for one year, all but 60 days of which was suspended, and to a fine of $500. Kelly thereupon referred the matter to Assistant U.S. Attorney Peter Hall in Vermont, who received authorization from the United States Attorney General's office pursuant to its "*Petite* policy"[3] to prosecute the defendants on federal charges based on the same conduct that gave rise to the state prosecution. On January 14, 1982, after evidence had been presented to a federal grand jury in Vermont, the present federal indictment was returned.

The defendants filed motions seeking to suppress their statements obtained and evidence seized at the time of arrest. They also moved to dismiss the indictment on several grounds, including alleged violations of the Speedy Trial Act, 18 U.S.C. §§ 3161, *et seq.*, and denial of due process. The latter claim was based on the defendants' assertion that the government's decision to reinstitute federal charges against them after they had pleaded guilty to reduced state charges arising out of the same conduct was in retaliation for their successful state plea negotiations. Judge Holden denied suppression and found the sanctions provisions of the Speedy Trial Act to be inapplicable. However, in a reasoned opinion he also found that, although "there is no evidence that the federal prosecution was motivated by malice or bad faith," reinstitution of the

committed under this subsection or a temporary release in the custody of an officer of such institution for the following purposes only: to attend the funeral of a relative; to visit a critically ill relative; or to obtain emergency medical or psychiatric services unavailable at said institution. Prosecutions commenced under this section shall neither be continued without a finding nor placed on file."

3. The "*Petite* policy" is an internal statement by the United States Attorney General setting forth guidelines for federal prosecutors regarding dual and successive federal criminal prosecutions. The statement was first announced by the Attorney General in 1959, and was discussed by the Supreme Court in the case of *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). The current version, in effect at all relevant times in this case, precludes a federal prosecution following a state prosecution "based on substantially the same act or acts unless there is a compelling federal interest supporting the dual prosecution." The policy's purposes are to insure efficient use of resources and to avoid unfairness that might result from multiple prosecutions and punishments for the same acts. Under the policy a federal prosecutor is required to obtain authorization from the appropriate Assistant Attorney General before initiating the dual or successive prosecution. If such authorization is not obtained, the prosecutor may face dismissal of a conviction on the federal charge.

When a federal prosecutor applies for authority to conduct a dual or successive prosecution such authority will not be granted "unless an enhanced sentence in the federal prosecution is anticipated" such as "where the state prosecution resulted in a conviction for a misdemeanor and a conviction for a federal felony is anticipated." "Dual Prosecution and Successive Federal Prosecution Policies," United States Attorneys Manual § 9–2.142 (1980).

federal prosecution after disposition of the state case by pleas of guilty to reduced charges created an "appearance of vindictive retaliation" since the government was dissatisfied with the state plea bargain and had sought to interdict it by advising the defendants through the state district attorney that if it should be consummated they would face reinstituted federal charges. Judge Holden therefore dismissed the indictment on due process grounds.

Judge Holden concluded that the present case was governed by *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), which held that when a defendant exercises his statutory right, after being convicted of a misdemeanor in a lower state court, to obtain a trial *de novo* in that state's superior court, it is a denial of due process for the state prosecutor to respond by obtaining an indictment charging him with a felony based on the same conduct. The Supreme Court reasoned that, even though the prosecutor may not have acted in bad faith, such conduct was not constitutionally permissible because it would, by exposing defendant to more serious charges, inhibit him from exercise of his right to appeal or collaterally attack his misdemeanor conviction. *Blackledge* represented an application to the executive branch of the principle voiced earlier by the Supreme Court in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), that a trial judge may not, after a defendant successfully appeals his conviction, impose a more severe sentence upon the defendant following a new trial unless intervening objective information justifies such an increase; otherwise the defendant would be deterred by fear of retaliation on the judge's part from exercising his right to appeal or to attack his first conviction collaterally. The Court therefore held that a presumption of vindictiveness attached to the imposition of a more severe sentence after a successful appeal, which could be overcome only by adducing objective information justifying the increased sentence. See *Pearce, supra,* 395 U.S. at 726, 89 S.Ct. at 2081.

Judge Holden drew a parallel between *Blackledge* and the present case, concluding, even though two different sovereigns were involved, that the reinstituted federal prosecution denied the defendants due process because it created an appearance that the federal prosecutor was retaliating against the defendants for exercising their right to consummate a state plea bargain. Judge Holden found that the government's proof failed to dispel this appearance of vindictiveness.

## DISCUSSION

As the Supreme Court recently noted in *United States v. Goodwin,* —— U.S. ——, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982), the punishment of an individual for exercise of a constitutional or statutory right amounts to a denial of due process. "For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right." *Id.* at 2488 (footnote omitted).

In order to avoid requiring a court to go through the difficult process of attempting to ascertain the actual motive of the judge or prosecutor claimed to have acted vindictively, the Court presumed that certain conduct must be viewed as vindictive unless the presumption is rebutted, e.g., conduct such as a judge's imposition of an increased sentence upon retrial after a successful appeal, *North Carolina v. Pearce, supra,* or a prosecutor's obtaining of a felony indictment against a defendant who exercised his statutory right to obtain a trial *de novo* of a misdemeanor charge based on the same conduct, *Blackledge v. Perry, supra.* Based on common experience, these circumstances were deemed to pose a realistic likelihood of vindictiveness amounting to a denial of due process. On the other hand, due process being a flexible concept, *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), the prospect of vindictiveness was found to be too unlikely under other circumstances to violate a de-

fendant's constitutional rights. See, e.g., *Colten v. Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) (different court may impose increased sentence under state's two-tiered system for adjudication of misdemeanor charges); *Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) (jury may on retrial impose more severe sentence than that imposed by jury upon prior conviction that was reversed); *United States v. Goodwin, supra* (no presumption of vindictiveness when prosecutor obtains felony indictment while untried misdemeanor charges still pending against defendant).

 ■ Turning to the present case, the fact that the prosecutions of the defendants are by two different sovereigns, each acting independently under its own laws and in its own interest without any control of or by the other, renders inapplicable the concept of prosecutorial vindictiveness. In every case relied upon by the defendants the alleged vindictive conduct was by an official of a sovereign acting with respect to the defendant's exercise of rights under the law of that sovereign, for which it was responsible. See, e.g., *Blackledge, supra; Pearce, supra; Goodwin, supra; United States v. Groves,* 571 F.2d 450 (9th Cir.1978); *United States v. Ricard,* 563 F.2d 45 (2d Cir.1977), cert. denied, 435 U.S. 916, 98 S.Ct. 1471, 55 L.Ed.2d 507 (1978). So far we have been able to find only one decision ruling on the question of whether an indictment by one jurisdiction (state or federal) may be dismissed as vindictive because of the defendant's exercise of his rights in a prosecution by another jurisdiction based on the same nucleus of operative facts. In *United States v. DeMichael,* 692 F.2d 1059 (7th Cir.1982), the Seventh Circuit expressed the view that federal prosecution of a defendant following state prosecution of him for offenses based on the same conduct would not amount to "vindictive prosecution" precluded by *Blackledge.* Said the Court:

 "There is no principle of law which requires, as defendant's argument would

require, that a person who commits more than one crime may be prosecuted only for one of them. Likewise under our federal system there can be simultaneous federal and State prosecutions where similar or identical offenses under the two systems of law are committed as the result of particular conduct on the part of a defendant. Moreover, there is nothing more than exercise of normal prosecutorial discretion involved if the prosecuting attorney is satisfied to drop one prosecution if an adequate result is obtained in the other, or decides to proceed in the second case if an inadequate result is obtained in the first.

 "The United States Attorney in one district may properly take into consideration the results of prosecution in another district in determining whether to proceed with prosecution for the offenses committed within his bailiwick." *United States v. DeMichael, supra,* 692 F.2d at 1062.

A setting that involves the conduct of two independent sovereigns does not lend itself to the concept of vindictive prosecution. Absent any evidence or finding so far in the present case, for instance, that the State of Massachusetts acted as a tool of the federal government in filing the state charge against the defendants or in negotiating a plea agreement with them, it cannot be said that the federal prosecutor accepted any responsibility for the conduct of the state or the defendants in the initiation or disposition of the state case. The most that appears is that from the very outset the federal prosecutor steadfastly took the position that the federal interest in deterring illegal interstate firearms trafficking would be satisfied only if each of the defendants received a mandatory one-year sentence. Although one may reasonably disagree with his judgment in the matter, the evaluation of the charges clearly rested within his prosecutorial discretion. If the state should obtain a conviction carrying a mandatory one-year sentence, as appeared to be most likely,[4] a duplicative federal prosecution

---

**4.** The defendants, in statements given shortly after their arrest, appear to have admitted all of    the elements of the federal crimes alleged.

would then become both unnecessary and wasteful. Accordingly, the federal prosecutor deferred prosecution pending the outcome of the state case, consenting to dismissal of the federal complaints "without prejudice to the rights of the United States to reinstitute proceedings," which put the defendants on notice that the federal government would not be bound by any plea agreement they might negotiate with the state. Indeed, if the state prosecution had been controlled by the federal government, there never would have been a plea agreement of the type negotiated by the state. Thus, the federal prosecutor's reinstitution of federal charges was based not on hostility or a punitive animus toward the defendants but on his consistent appraisal of the federal government's interest in the matter as requiring imposition of the one-year term which the state initially sought.

Aside from the absence of a sound basis for an inference of vindictiveness, the district court's decision is inconsistent with the reasoning behind the settled principle that federal prosecution of a person for the same acts forming the basis of a previous state conviction does not violate the defendant's constitutional right to protection against double jeopardy. *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (defendants pled guilty to state charges and were later tried and convicted on federal charges stemming from the same facts); *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (defendant acquitted on federal bank robbery charges; thereafter, defendant tried and convicted on state charges arising from the same facts); *Delay v. United States,* 602 F.2d 173 (8th Cir.1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980) (defendant pled guilty to state charges, then was tried and convicted on federal charges arising out of the same incident); *United States v. Hayes,* 589 F.2d 811 (5th Cir.) (defendant tried and convicted on state charges, then tried and convicted on federal charges based on same facts), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60

(1979); *United States v. Barone,* 467 F.2d 247, 250 (2d Cir.1972) (same).

The Supreme Court's reasoning was summed up in *Abbate, supra,* in its quotation of Chief Justice Taft's earlier opinion in *United States v. Lanza,* 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922):

" 'We have here two sovereignties, deriving power from different sources, capable of dealing with the same subject matter within the same territory.... Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.

" 'It follows that an act denounced as a crime by both ·national and state sovereignties is an offense against the peace and dignity of both and may be punished by each. The Fifth Amendment, like all the other guaranties in the first eight amendments, applies only to proceedings by the Federal Government, ... and the double jeopardy therein forbidden is a second prosecution under authority of the Federal Government after a first trial for the same offense under the same authority.' 260 U.S. at 382 [43 S.Ct. at 142].' "
*Abbate v. United States, supra,* 359 U.S. at 194, 79 S.Ct. at 670.

Although the Fifth Amendment, at the time when *Bartkus* and *Abbate* were decided, did not apply to the states, in 1969 it was held to be incorporated by reference in the Fourteenth Amendment and thus applicable to the states. See *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). This led to strong criticism of *Bartkus* and *Abbate,* based on the contention that successive state-federal prosecutions arising out of the same conduct amount to double jeopardy. See, e.g., *United States v. Grimes,* 641 F.2d 96, 100 (3d Cir.1981) ("permitting successive state-federal prosecutions for the same act may be viewed as inconsistent with what is a most ancient principle in western jurisprudence—that the government may not twice place a person in jeopardy for the same offense").[5]

**5.** See also Fisher, *Double Jeopardy, Two Sovereignties and the Intruding Constitution,* 28 U.Chi.L.Rev. 591 (1961); Franck, *An Interna-*

Notwithstanding this criticism, the Supreme Court in *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), reaffirmed its approval of the "dual-sovereignty" principle of *Bartkus* and *Abbate,* holding that federal prosecution of a defendant was not precluded under the Double Jeopardy Clause by his prior conviction by an Indian tribal court of a lesser offense arising out of the same conduct, stating:

> "*Bartkus* and *Abbate* rest on the basic structure of our federal system, in which States and the National Government are separate political communities. State and Federal Governments '[derive] power from different sources,' each from the organic law that established it. *United States v. Lanza,* 260 U.S. 377, 382 [43 S.Ct. 141, 142, 67 L.Ed. 314]. Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses, and in doing so each 'is exercising its own sovereignty, not that of the other.' *Ibid.* And while the States, as well as the Federal Government, are subject to the overriding requirements of the Federal Constitution, and the Supremacy Clause gives Congress within its sphere the power to enact laws superseding conflicting laws of the States, this degree of federal control over the exercise of state governmental power does not detract from the fact that it is a State's own sovereignty which is the origin of its power." *United States v. Wheeler, supra,* 435 U.S. at 320, 98 S.Ct. at 1084.

The defendants' various other arguments in support of dismissal of the indictment either are meritless or must be rejected at this stage for the reason that they would require factual findings that have not been made. For instance, having lost their claim in the district court that the indictment is dismissible under the Speedy Trial Act, 18 U.S.C. §§ 3161, *et seq.,* a claim which is not advanced on this appeal, defendants here press for dismissal under F.R.Cr.P. 48(b), urging that the government's pre-indictment delay was purposeful and unnecessary. See *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

The government has indicated that the reason for the delay in prosecuting the defendants was that federal authorities reasonably believed that Massachusetts would continue to prosecute the defendants under Mass.Gen.Laws Ann. Ch. 269, § 10(a). The defendants point to nothing in the record which casts doubt on this asserted basis for delay. Nor is there evidence that defendants actively pursued their right to a speedy federal prosecution or that they were prejudiced by the delay. However, defendants are not precluded upon remand from adducing evidence of relevant circumstances claimed to demonstrate that the essential *Barker v. Wingo* prerequisites exist. Although there is no evidence in the record supporting the defendants' claim that the government violated their due process rights by engaging in delay for the purpose of gaining a "tactical advantage over the accused," see *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971), the matter is remanded to the district court to permit the defendants to offer proof. Similarly, defendants' unsupported claim that the state acted as a "tool" of the federal prosecutor, rendering the present indictment a violation of the Double Jeopardy Clause of the Fifth Amendment, *Bartkus v. Illinois, supra,* 359 U.S. at 123–24, 79 S.Ct. at 678–79, is remanded for such evidentiary hearing as is required even though it is clearly meritless on the record as it now stands.

The defendants next contend that Assistant U.S. Attorney Kelly promised them that he would be satisfied with the state prosecution and that the federal charges

*tional Lawyer Looks at the Bartkus Rule,* 34 N.Y.U.L.Rev. 1096, 1103–04 (1959); Grant, *The Lanza Rule of Successive Prosecutions,* 32 Colum.L.Rev. 1309 (1932); Harrison, *Federalism and Double Jeopardy: A Study in the Frustra-*

*tion of Human Rights,* 17 U.Miami L.Rev. 306 (1963); Note, *Double Prosecution by State and Federal Governments: Another Exercise in Federalism,* 80 Harv.L.Rev. 1538, 1541 (1967).

would be dismissed, thereby leading them to change their position in reliance on the promise and entitling them to enforcement of it, citing *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). Some doubt is cast upon this claim by evidence that the federal complaint was dismissed on the understanding that the state would prosecute the defendants under Mass.Gen.Laws Ann. Ch. 269, § 10(a), carrying a one-year mandatory minimum prison term, which it did not continue to do; in addition, defendants' claim is inconsistent with the written dismissal itself, which was filed in the district court. The dismissal states expressly "that at this time the United States Attorney has decided to defer to local prosecution ... without prejudice to the rights of the United States to reinstitute proceedings against one or all of the defendants named in the Complaint." It seems unlikely that the federal prosecutor would have used this language, which is part of the publicly available record in the case, if he had made the promise attributed to him by the defendants. Although this evidence would appear to mandate rejection of defendants' *Santobello* claim, we leave the matter to the district court for final action upon remand.

■ Finally, defendants contend that the dismissal of the indictment should be upheld on the ground that the government violated its "*Petite* policy," see note 3, *supra.* There is evidence that the Justice Department in fact made a determination in this case that a separate federal prosecution was justified by federal interests, as the *Petite* policy requires. Even if the federal prosecutor and the Justice Department violated that policy, however, dismissal of the indictment for non-compliance with the policy would not be warranted. See *United States v. Sandate,* 630 F.2d 326, 327–28 (5th Cir. Unit A 1980), *cert. denied,* 450 U.S. 922, 101 S.Ct. 1372, 67 L.Ed.2d 351 (1981); *Delay v. United States,* 602 F.2d 173 (8th Cir. 1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980); *United States v. Hayes,* 589 F.2d 811, 818 (5th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *United States v. Hutul,*

416 F.2d 607, 626–27 (7th Cir.1969), *cert. denied,* 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970); *The Petite Policy: An Example of Enlightened Prosecutorial Discretion,* 66 Geo.L.J. 1137, 1147 (1978). That policy is merely an internal guideline for exercise of prosecutorial discretion, not subject to judicial review, see *Sullivan v. United States,* 348 U.S. 170, 172–74, 75 S.Ct. 182, 184–85, 99 L.Ed. 210 (1954). It is not a statute or regulation; nor is it constitutionally mandated. *Rinaldi v. United States,* 434 U.S. 22, 29, 98 S.Ct. 81, 85, 54 L.Ed.2d 207 (1977). To hold the policy legally enforceable would be to invite the Attorney General to scrap it, which would hardly be in the public interest. Thus, even if the exercise of prosecutorial discretion may have been ill-advised, the district court, assuming the defendants were to be convicted of the federal offenses charged, would retain wide discretion as to the punishment that might be imposed.

The dismissal of the indictment is reversed.